IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THEODORE L. HANSEN, INTERSTATE ENERGY CORP., and TRIPLE M. L.L.C., | |
| Plaintiffs, | ORDER DENYING NEWCOMB DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS |
| vs. | |
| NATIVE AMERICAN REFINERY COMPANY, ET AL., | Case No. 2:06cv00109 |
| Defendants. | |

Defendants Fred Newcomb and Newcomb & Company (collectively, "Newcomb defendants") have mounted repeated challenges to the plaintiffs' pleadings. Currently at issue is the Newcomb defendant's Rule 12(b)(6)[1] motion to dismiss the plaintiffs' claim filed pursuant to the Racketeer Influenced and Corrupt Organizations Act.[2] Specifically, in this motion, the Newcomb defendants argue that Count XI of the second amended complaint should be dismissed because it does not allege a pattern of racketeering activity as required by RICO. Because the

---

[1] Fed. R. Civ. P. 12(b)(6).

[2] 18 U.S.C. § 1961–68.

court cannot say that the plaintiffs are unable to "prove [any] set of facts"[3] which would entitle them to relief under RICO, the court DENIES the Newcomb defendants' motion to dismiss.

## BACKGROUND

This case arises from a series of conversations, negotiations, and business agreements between Plaintiff Theodore Hansen and his business entities, and a number of defendants, including the Newcomb defendants.  Broadly, Mr. Hansen alleges the Newcomb defendants conspired with the other defendants in this case in an "enterprise designed and intended to defraud the plaintiffs and others using BNI bank guarantees of questionable validity."[4]

According to the plaintiffs, Defendant Native American Oil Refinery ("NARCO") approached Mr. Hansen regarding its possible purchase of his interests in various gas stations, convenience stores, and real estate in early 2003.[5]  Laying groundwork for a possible agreement, Mr. Hansen investigated NARCO's ability to finance the proposed transaction.  In the course of his investigation, Defendants Steve Finkel-Minkin (NARCO's CEO),[6] and Robert McKee (NARCO's President),[7] repeatedly assured Mr. Hansen that NARCO possessed sufficient financial resources to complete the transaction, including a billion-dollar oil refinery and several

---

[3] *Gaines-Tabb v. ICI Explosives*, 160 F.3d 613, 619 (10th Cir. 1998)

[4] Pls.' Second Am. Cmpl. ¶ 44 (Docket No. 65).

[5] *Id.* ¶ 15.

[6] *Id.*

[7] *Id.*

hundred million dollars in assignable and transferable bank guarantees from BNI, an Indonesian bank.[8]  Mr. Hansen also spoke via telephone with officers of BNI, who confirmed the existence and validity of the bank guarantees and vouched for NARCO's financial condition.[9]

The plaintiffs allege that, in reliance upon these representations, Mr. Hansen entered into a contract with NARCO ("the 2003 agreement") in which he agreed to transfer to them his interests in Seven C Corporation, Speedy Turtle, LLC, and Timberwolf Lodge in exchange for $50 million and NARCO's promise to invest an additional $50 million toward Mr. Hansen's future business ventures.[10]  NARCO secured its performance under the agreement by pledging $50 million worth of assignable bank guarantees issued by BNI to Mr. Hansen.[11]  The Newcomb defendants were to hold the bank guarantees in escrow until shortly before their maturity date.[12] The Newcomb defendants verified the validity of the bank guarantees.  Then, in June 2003, Mr. Newcomb spoke to Mr. Hansen by telephone, assuring him the BNI guarantees had been properly assigned to him and vouching for NARCO's financial capacity.[13]

The plaintiffs contend Mr. Newcomb took this action in furtherance of a fraudulent

---

[8] *Id.* ¶¶ 17–19.

[9] *Id.* ¶ 20.

[10] *Id.* ¶¶ 22–23.

[11] *Id.* ¶ 24.

[12] *Id.* ¶ 25.

[13] *Id.* ¶¶ 27–28.

scheme wherein Mr. McKee, Mr. Finkel-Minkin, and Mr. Newcomb had agreed to engage in a conspiracy designed to defraud him and others using the BNI bank guarantees.  The plaintiffs claim that NARCO has failed to pay both its obligations to him and to the creditors of the entities Mr. Hansen transferred to NARCO as part of the 2003 agreement.[14]  Then, to forestall any recovery action by the plaintiffs, NARCO allegedly entered into a second agreement to pay an additional $15 million to Mr. Hansen for the assets transferred through the 2003 agreement.[15] The plaintiffs also allege Mr. McKee and Mr. Finkel-Minkin took the profits from Seven C Corporation, Speedy Turtle, LLC, and Timberwolf Lodge for themselves.  In the meantime, Mr. Hansen and his related entities have been unable to recoup their losses — because of NARCO's refusal to pay, their creditors have foreclosed.[16]  Finally, the plaintiffs contend that as of the time of the filing of the second amended complaint, the Newcomb defendants still retained the BNI bank guarantees in their possession[17] and that BNI continued to deny their issuance and refuses to pay on them.[18]

With regard to their RICO claim, the plaintiffs allege the Newcomb defendants, in connection with the enterprise alleged above, made false representations, via telephone, fax, e-

---

[14] *Id.* ¶ 33.

[15] *Id.* ¶¶ 45–46.

[16] *Id.* ¶¶ 52–53.

[17] *Id.* ¶ 29.

[18] *Id.* ¶¶ 43, 59–61.

mail, and other methods of communication, with the intent to defraud the plaintiffs.  This

occurred more than eleven separate times from June to November of 2003.  The plaintiffs

specifically recite the following instances as the predicate acts for their RICO claim:

1. Newcomb fraudulently verified the existence of BNI bank guarantees to Mr. Hansen, by telephone, in early June 2003.

2. In a September 2003 telephone conversation, Mr. Newcomb persuaded Mr. Wilkinson to accept BNI bank guarantees as security for his debts.

3. On September 27, 2003, Mr. Newcomb sent a letter to Mr. Wilkinson informing him that he had $10 million worth of BNI bank guarantees.

4. On September 27, 2003, Mr. Newcomb sent a letter to Mr. Wilkinson informing him that he had $5 million worth of BNI bank guarantees in his possession.

5. On five different occasions, from September to November of 2003, Mr. Newcomb falsely assured Mr. Hansen, by telephone, that NARCO would pay its obligations in the near future and that he was working to obtain BNI bank guarantees for NARCO's creditors.

6. On October 24, 2003, Mr. Newcomb mailed a letter to Stephen Tiffany falsely claiming that NARCO had bank instruments in its possession that were payable at a bank in New York City or at NARCO's main office.

7. Around November 2003, Mr. Newcomb assured Mr. McDougal, by phone, that he held BNI bank guarantees that could be assigned to Triple M as collateral.

8. Mr. Finkel-Minkin and Mr. McKee falsely assured Mr. Hansen, though fax, letter, and other electronic transmissions, that NARCO had sufficient funds to finance its obligations under the June 2003 agreement.

9. Mr. Finkel-Minkin and Mr. McKee, through representations made in faxes, letters, and other electronic transmissions, falsely assured Mr. Hansen, Seven C, Speedy Turtle, and Timberwolf Lodge that NARCO intended to pay its obligations.

10. Agents for BNI falsely, and with intent to obtain property and money by false pretenses, assured Mr. Hansen and Triple M that the BNI bank guarantees were valid and that NARCO had the financial capacity to perform the June 2003 agreement.

11. BNI made false assurances to Triple M in writing and via telephone that it had issued valid and enforceable bank guarantees to secure NARCO's obligations under the June 2003 agreement.

Although these specific predicate acts allegedly occurred between June 2003 and January 2004, the RICO claim incorporates all other allegations in the plaintiffs' second amended complaint by reference, including the allegations that the Newcomb defendants wrongfully retained the bank guarantees in their possession as of January 2007.

## STANDARD OF REVIEW

Dismissal under Rule 12(b)(6) is proper only when "it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[19]  In reviewing the sufficiency of the complaint, a court must "accept[] the well-pleaded allegations of the complaint as true and contru[e] them in the light most favorable to the plaintiff."[20]  A court evaluating a 12(b)(6) motion should not "weigh potential evidence that the parties might present at trial, but [should] assess whether the plaintiff's claim alone is legally sufficient" to provide relief.[21]  The court considers the Newcomb defendants' motion in accordance with these well-settled standards.

---

[19] *ICI Explosives*, 160 F.3d at 619 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).

[20] *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quoting *Yoder v. Honeywell*, 104 F.3d 1215, 1224 (10th Cir. 1997)).

[21] *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)).

**<u>DISCUSSION</u>**

The Newcomb defendants contend the plaintiffs' RICO claim should be dismissed

pursuant to Rule 12(b)(6) because the plaintiffs failed to allege a pattern of racketeering activity.

Specifically, the Newcomb defendants argue that the plaintiffs' alleged scheme consists only of a

"single episode"[22] with a "built-in end point"[23] and the plaintiffs make no allegations "of long-

term criminal activity or threat of continuing criminal activity."[24]  The Newcomb defendants

contend the plaintiffs' claim is, therefore, insufficient.  The plaintiffs respond by arguing that

predicate acts within a single scheme may support a RICO claim, and that the alleged scheme did

pose a threat of continuing criminal activity.

At the outset, the court notes that both parties have briefed whether the heightened

pleading requirements of Rule 9 apply to all elements of a RICO claim or only to the predicate

acts showing.  Rule 9(b) requires that a plaintiff set forth the "the circumstances constituting

fraud or mistake . . . with particularity."[25]  The court finds it unnecessary to address this question

since the plaintiffs' second amended complaint pleads both the predicate acts and the pattern

elements with sufficient particularity to satisfy the Rule 9(b)'s requirements.  The plaintiffs'

second amended complaint sets forth specific conduct constituting related predicate acts and

---

[22] Defs.' Mem. Supp. Mot. Dismiss 5 (Docket No. 68).

[23] *Id.* at 6

[24] *Id.* at 5.

[25] Fed. R. Civ. P. 9(b).

demonstrating close-ended and open-ended continuity.

## I.     Sufficiency of a Single Scheme

The Newcomb defendants make much of the fact that rather than alleging the existence of predicate acts occurring within multiple illegal schemes, the plaintiffs rely on a single scheme to support their RICO claim.  The court finds the plaintiffs' reliance on a single scheme is legitimate.

Before the Supreme Court's decision in *H.J. Inc. v. Northwestern Bell Telephone Co.*,[26] some courts had held that RICO's pattern requirement was not satisfied by predicate acts which all occurred within a single illegal scheme.[27]  In *Northwestern Bell*, however, the Supreme Court rejected this interpretation, after examining RICO's legislative history.  The Court held that "although proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity, it is implausible to suppose that Congress thought continuity might be shown only by proof of multiple schemes."[28]

In other words, even if all the predicate acts the plaintiffs alleged occurred in furtherance of a single scheme, such allegations may be sufficient to establish a RICO claim.  In this case, the plaintiffs allegations of predicate acts are sufficiently specific.  The plaintiffs list numerous acts

---

[26] 492 U.S. 229 (1989).

[27] *See, e.g.*, *Deviries v. Prudential-Bache Sec., Inc.*, 805 F.2d 326, 329 (8th Cir. 1986).

[28] *Northwestern Bell*, 492 U.S. at 240.

that include dates and the names and conduct of the parties involved.  Therefore, the court considers the existence of a single scheme only insofar as it is relevant to the question of whether the alleged acts constitute a threat of continuing criminal activity.[29]

## II.     Threat of Continuing Criminal Activity

The Newcomb defendants' primary argument in favor of dismissing the plaintiffs' RICO claim is based on the continuity element of RICO's pattern requirement.  Specifically, the Newcomb defendants argue the plaintiffs failed to allege a threat of continuing criminal activity existed.

Because RICO is not targeted at "sporadic activity"[30] or the "isolated offender,"[31] a plaintiff bringing a RICO claim must plead facts sufficient to support a finding that the predicate acts alleged "amount to, or . . . otherwise constitute a threat of, continuing criminal activity."[32] This requirement of continuity, and RICO's pattern requirement more broadly, are designed to ensure that RICO is only employed in the long-term criminal situations envisioned by Congress, rather than in garden-variety fraud cases.[33]  A plaintiff may satisfy the continuity requirement

---

[29] *Id.*

[30] *Sedima v. Imrex Co., Inc.*, 372 U.S. 479, 496 n.14 (1985) (quoting S. REP. NO. 91-617, at 158 (1969)).

[31] *Id.* (quoting 116 CONG. REC. 18,940 (1970) (statement of Sen. McClellan).

[32] *Northwestern Bell*, 492 U.S. at 240.

[33] *See Tabas v. Tabas*, 47 F.3d 1280, 1310 (3d Cir. 1995).

either through a showing of closed or open-ended continuity.[34]  In this case, under either

approach, the plaintiffs' allegations are sufficient to meet the continuity requirement.

     *A.*     *Close-ended Continuity*

With regard to close-ended continuity, the plaintiffs have adequately alleged both the

duration and the extensiveness of the defendants' scheme.

A party can establish close-ended continuity by showing that the alleged criminal activity

"extend[ed] over a substantial period of time."[35]  "[A]cts extending over a few weeks or months

are insufficient to show close-ended continuity."[36]  Courts must consider both the temporal

duration and the extensiveness of the alleged fraudulent scheme when making a determination of

close-ended continuity.[37]

     1.    Duration

In their second amended complaint, the plaintiffs list specific predicate acts occurring

between June 2003 and January 2004, a total of seven months.  But courts measure continuity as

of the time the plaintiff files suit.[38]  And taking the plaintiffs' well-pleaded allegations as true, it

is reasonable to find that the scheme had lasted from June 2003 until the time the plaintiffs filed

---

[34] *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993).

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.* at 1545.

their second amended complaint in January 2007.  The plaintiffs have alleged that through

January 2007, the Newcomb defendants wrongfully continued to retain the BNI bank guarantees

and that BNI continued to deny their issuance and validity.  If the plaintiffs were able to adduce

evidence to this effect, the alleged scheme would have lasted from June 2003 to the institution of

the litigation.  Three and one-half years is well beyond the few weeks or months the Supreme

Court stated would be insufficient to show a threat of future criminal conduct[39] and substantially

longer than the seven to eighteen month scheme that the Tenth Circuit found satisfied the

requirements of close-ended continuity in *Resolution Trust Corp. v. Stone*.[40]  The court,

therefore, finds the duration of the scheme alleged by the plaintiffs sufficient to meet the

temporal requirement for a finding of closed continuity.

### 2.    Extensiveness

Even if the predicate acts had not spanned such a substantial time period, the second

amended complaint alleges the type of extensive scheme that the Tenth Circuit has held will

support a finding of close-ended continuity.

In *Resolution Trust*, the Tenth Circuit set out five factors courts should consider when

assessing the extensiveness of an alleged RICO scheme: (1) the number of victims; (2) the

number and variety of racketeering acts; (3) the distinctness of the injuries suffered; (4) the size

---

[39] *See Northwestern Bell*, 492 U.S. at 242.

[40] 998 F.2d at 1544.

and complexity of the alleged scheme; and (5) the nature and character of the alleged scheme.[41]
Taking the plaintiffs' allegations as true and considering these *Resolution Trust* factors, it is clear
that the scheme alleged by plaintiffs is not the type of narrow scheme Congress intended to
exclude from RICO's coverage.

The first *Resolution Trust* factor centers around the number of victims of the alleged
scheme.  Although the plaintiffs allege a scheme focused on a single goal, the conduct involved
multiple victims and perpetrators.  The plaintiffs' second amended complaint specifically alleges
that Mr. McKee, Mr. Finkel-Minkin, NARCO, the Newcomb defendants, and BNI were involved
as perpetrators.  The plaintiffs also claim that Mr. Hansen, and the Hansen entities transferred
under the 2003 agreement were direct victims of the defendants' scheme.  In addition, the
plaintiffs refer to creditors of the transferred entities as victims of the defendants' scheme.  In
other words, the plaintiffs allege more than just the named plaintiffs suffered as victims of the
defendants' actions.

The number and variety of predicate acts also establish the extensiveness of the
racketeering scheme alleged.  In *Resolution Trust*, the court found that a scheme involving only
mail fraud and wire fraud was sufficiently extensive because the mail and wire fraud were
central, rather than tangential, to the alleged scheme.[42]  In this case, the plaintiffs have
specifically alleged a number of different defendants committed more than eleven various acts of

---

[41] *Id.* at 1543–44.

[42] *Id.* at 1544.

mail and wire fraud against multiple individuals.  Similar to *Resolution Trust*, the alleged

fraudulent representations by phone, mail, and e-mail were absolutely essential to the scheme's

operation and success.  The entire scheme hinged on the defendants' ability to deceive the

plaintiffs and others as to the financial capacity of NARCO.  Therefore, here, as in *Resolution*

*Trust*, the number and variety of predicate acts weighs in favor of a finding of extensiveness.

   Pursuant to *Resolution Trust*, the court must next consider the distinctness of the injuries

resulting from the alleged scheme.  The plaintiffs have alleged four distinct groupings of injuries

from the scheme: (1) the injuries suffered by Mr. Hansen and his transferred entities due to

NARCO's refusal to pay the purchase price of the Hansen entities transferred under the 2003

agreement; (2) the injuries suffered by Mr. Hansen and his transferred entities resulting from

NARCO's refusal to invest in his future business ventures; and (3) the injuries suffered by Mr.

Hansen and his transferred entities by NARCO's agreement to pay an additional $15 million in

an attempt to forestall any recovery action, and (4) the injuries suffered by the creditors of the

entities transferred under the 2003 agreement due to NARCO's refusal to pay debts owed by the

entities.  Accepting the plaintiffs' allegations as true, therefore, the defendants' scheme caused

various injuries that extended well beyond Mr. Hansen himself.  Therefore, this factor also

weighs in favor of a finding of extensiveness and continuity.

   Further, under the *Resolution Trust* extensiveness inquiry, the alleged scheme was both

complex and large.  It was international in scope and involved substantial coordination between

several separate businesses and parties.  For instance, the plaintiffs allege collusion between an

Indonesian bank (BNI), a large U.S. corporation (NARCO), the Newcomb defendants, and

various individuals.  They also allege that fraudulent representations were made to individuals

and businesses doing business in Utah, Idaho, and Wyoming.  The scope of the scheme and

coordination involved help establish the required extensiveness and continuity.

The final *Resolution Trust* factor relates to the nature and character of the alleged scheme.

The plaintiffs' RICO claim sets forth a conspiratorial enterprise in which multiple individuals

agreed to defraud the plaintiffs of payments and investment capital.  If the plaintiffs' allegations

are proven true, the number of parties involved and coordination between them separates this

case from garden-variety fraud cases and plants it firmly within the realm in which Congress

envisioned RICO would be employed.

The court finds, therefore, that each of the *Resolution Trust* factors weighs in favor of a

finding of an extensive scheme in this case.  Considering this extensiveness in conjunction with

the duration of the scheme, the court concludes the plaintiffs have pleaded specific allegations

that, should they be proven true, could support a finding of close-ended continuity in this case.

B.       *Open-ended Continuity*

Even if the plaintiffs had not alleged facts sufficient to support a finding of close-ended

continuity, they have alleged facts sufficient to support a finding of open-ended continuity.

In *Northwestern Bell*, the Supreme Court acknowledged that, in many cases, "a RICO

action will be brought before [close-ended] continuity can be established," and that, "[i]n such

cases, liability depends on whether the *threat* of continuity is demonstrated."[43]  The Court noted

---

[43] *Northwestern Bell*, 492 U.S. at 242.

that a threat of continuity may be established when the predicate acts themselves evidence a danger of future repetition, or when a plaintiff can sufficiently establish that the predicate acts are part of an entity's regular way of conducting its ongoing legitimate business or its RICO enterprise.[44]

The Tenth Circuit briefly discussed the concept of open-ended continuity in *Resolution Trust*. Although ultimately holding that the plaintiffs had sufficiently alleged close-ended continuity, the *Resolution Trust* court noted, in dicta, that the plaintiffs had also alleged facts sufficient to support a finding of open-ended continuity.[45] In particular, the court observed that, as of the time the action was filed,[46] it was reasonable to conclude there was a threat that predicate acts would continue in the future — thus showing a threat of continuing criminal activity.[47] In this case, the plaintiffs' allegations could support both a finding that a continued threat of criminal activity existed and that the predicate acts are part of ongoing entities' regular ways of doing business.

With regard to the threat of continued criminal activity, the plaintiffs have alleged that the Newcomb defendants and BNI continued their fraudulent practices up to the time of the filing of the plaintiffs' second amended complaint. In particular, the plaintiffs have alleged the Newcomb

---

[44] *Id.* at 243.

[45] *Resolution Trust*, 998 F.2d at 1545.

[46] *Id.*

[47] *Id.*

defendants continued to withhold the BNI bank guarantees and that BNI continued to falsely deny their issuance and validity.  By alleging wrongful activity continued to this time, the plaintiffs have sufficiently demonstrated the threat of continued criminal activity existed as of the time the lawsuit was filed (the point from which continuity is measured).[48]  Further, contrary to the Newcomb defendants' claim, the scheme had no built-in end point.  For instance, the scheme did not end when NARCO failed to pay.  Instead, NARCO promised the plaintiffs an additional $15 million in an attempt to forestall any recovery action.  In short, the plaintiffs' pleading demonstrates a threat of continuing activity sufficient to survive a motion to dismiss.

   With regard to the entities' business activities, the plaintiffs' allegations could support a finding that the defendants' wrongful actions constituted their regular way of doing business. The plaintiffs allege that Mr. McKee, a key figure in the scheme to defraud, was both the President of NARCO and the managing director and a division head of Newcomb & Company. From this allegation, as well as the comprehensive nature of the scheme, it is reasonable to infer that the connections between NARCO and the Newcomb defendants were not limited to this scheme, but that the defendants worked together as a regular business practice, just as they worked together to defraud the plaintiffs.  Further, it can be reasonably inferred that the predicate acts of the Newcomb defendants — verifying the validity of bank guarantees — were part of their regular way of conducting ongoing legitimate business.  As an investment banker, Mr. Newcomb would make such verifications, would hold guarantees in escrow, and would verify the

---

[48] *Resolution Trust*, 998 F.2d at 1545.

financial capacity of various companies.  Additionally, the plaintiffs allege the defendants met and "confirmed" a plan to defraud.  This allegation offers support for the proposition that the misconduct was part of the defendants' regular way of doing business, since the scheme was "confirmed" rather than "hatched" at this meeting.  In sum, it simply is not clear to the court that the plaintiffs would be unable to prove any set of facts which could support a finding of continuity sufficient for a valid RICO claim.

## CONCLUSION

The plaintiffs' allegations, if true, could support a finding of close-ended or open-ended continuity and, hence, a valid RICO claim.  Therefore, the court DENIES the defendants' Rule 12(b)(6) motion to dismiss Count XI of the plaintiffs' second amended complaint [#67].

DATED this 10th day of April, 2007.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge