IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| THEODORE L. HANSEN; INTERSTATE ENERGY CORP.; TRIPLE M, L.L.C., <br><br> Plaintiffs, <br><br> v. <br><br> NATIVE AMERICAN REFINERY COMPANY, A.K.A. NATIVE AMERICAN REFINERY COMPANY, INC.; PT. BANK NEGARA INDONESIA (PERSERO) TBK; EKO BUDIWIYONO; DRS. FIRMANSYAH; GATOT SISMOYO; RACHMAT WIRIATMAJA; YOPIE LAMONGE; MAX NIODE; LILLES HANDAYANI; UTTI KARIAYAM; MURARIK AS DJATIMUDA; STEVE O.Z. FINKEL-MINKIN, A.K.A. STEVE FINKEL; ROBERT MCKEE; FRED NEWCOMB; NEWCOMB & COMPANY and DOES 1-20, <br><br> Defendants. | **MEMORANDUM OPINION AND ORDER** <br><br> Case No. 2:06-CV-109 <br><br> Judge Dee Benson |

This matter is before the court on defendants Fred Newcomb and Newcomb & Company's (collectively "Newcomb") motion for summary judgment. (*See* Dkt. No. 195.) Newcomb requests that this court enter summary judgment in his favor on all counts of plaintiffs Theodore Hansen, Interstate Energy Corporation, and Triple M, L.L.C.'s second amended complaint, including Count V (Fraud), Count VI (Civil Conspiracy), Count VIII (violation of Rule 10(b)-5, 15 U.S.C. § 78(j)(b)), Count X, (violation of Utah Code § 61-1-22(4)(a)), Count XI (violation of 18 U.S.C. § 1962(c)), Count XIV (Unjust Enrichment), Count XV (Conversion), and Count XVI (Breach of the Covenant of Good Faith and Fair Dealing).

On March 10, 2010, the court held a hearing on the motion. At the hearing, Newcomb was represented by Stephen K. Christiansen and Brian C. Carroll and plaintiffs were represented

by Mark F. James.  Counsel for defendants Native American Oil Refinery Company ("NARCO") and P.T. Bank Negara Indonesia ("BNI") were also present.  After taking the matter under advisement, the court has further considered the law and facts relating to the motion.  Being fully advised, the court renders the following Memorandum Opinion and Order.

BACKGROUND

This case arises from a series business agreements between Theodore Hansen, his business entities, and NARCO.  Fred Newcomb is the owner and operator of a small independent securities broker-dealer and investment banking business, called Newcomb & Company.  In 2003, the President of NARCO, Robert McKee asked Newcomb to hold certain bank guarantees issued by BNI to NARCO.  Newcomb held the BNI bank guarantees from 2003 until 2005, when McKee asked for their return.

In early 2003, NARCO entered negotiations with Hansen to purchase Hansen's interest in various gas stations, convenience stores, and real estate.  During negotiations, Hansen investigated NARCO's ability to finance the transaction.  In the course of the investigation, Hansen reviewed boxes of documents from NARCO and spoke about NARCO with the Tax Commission of Louisiana, the Department of Licensing of Louisiana, Dun & Bradstreet, Chevron Oil, and other gas station owners.  In addition, Hansen alleges that Steve OZ Finkel-Minken (NARCO's CEO) and McKee (NARCO's president) assured him that NARCO possessed sufficient financial resources to complete the transaction, including a billion-dollar oil refinery and several hundred million dollars in assignable and transferable BNI bank guarantees.  Hansen claims the he spoke via telephone with officers of BNI, who confirmed the existence and validity of the bank guarantees and vouched for NARCO's financial condition.

On May 31, 2003 and June 1, 2003, Hansen entered into three agreements (the "June 2003 agreements") with NARCO in which he agreed to transfer to NARCO his interest in Seven

C Corporation, Speedy Turtle, LLC, and Timberwolf Lodge in exchange for payment and NARCO's promise to invest in Mr. Hansen's future business ventures. NARCO allegedly secured its performance under the agreements by pledging assignable BNI bank guarantees to Hansen.

In or about early June 2003[1], Hansen spoke to Newcomb by telephone. Hansen alleges that Newcomb confirmed that: NARCO owned an oil refinery and substantial petroleum assets; Newcomb had previously arranged financing for McKee in the past for millions of dollars, and he had a long-standing relationship with McKee; Newcomb was aware of Hansen's transaction and was holding the bank guarantees as an escrow officer; that NARCO was involved in other transactions, that Newcomb believed that NARCO had the credit capacity to complete these transactions; and NARCO had assigned the relevant bank guarantees to Hansen.

In September 2003, NARCO failed to pay Hansen and/or his creditors as required by the June 2003 agreements. Hansen claims he gave NARCO additional time to perform its obligations because McKee, Finkel-Minken, Newcomb and others assured Hansen that NARCO had the capacity to pay its obligations and would do so in short order.

On November 20, 2003, NARCO and Triple M[2] entered into an agreement whereby NARCO guaranteed loans that Triple M had made to Hansen, and NARCO agreed to provide as collateral a BNI bank guarantee. This bank guarantee was to be issued to Triple M. One of Triple M's owners, Mark McDougal, claims he spoke several times with two individuals at BNI, negotiated several terms of the Triple M-BNI bank guarantee directly with BNI, and confirmed that the guarantee was valid and legitimate. McDougal also took a copy of another

---

[1] *See* Dkt. No. 65, Pl.'s Second Am. Compl. ¶ 27.

[2] Triple M is in the business of real estate investment and private lending, and was formed for the purpose of making loans to Hansen's entities.

BNI bank guarantee to an employee of Merril Lynch who confirmed that the BNI bank guarantee provided to McDougal was legitimate.  In December 2003 or January 2004, McDougal spoke with Newcomb once on the telephone.  McDougal claims that Newcomb told him that he was holding NARCO's original bank guarantees and that he had verified them, and that he thought they were valid.

Interstate Energy, a Hansen-owned company, is a successor to the remaining assets of Speedy Turtle.  In early 2004, NARCO agreed to purchase additional property from Interstate Energy.  As security, NARCO offered Interstate Energy BNI standby letters of credit. NARCO never paid any of the money it contracted and committed to pay for gas stations, convenience stores, real estate and related businesses and assets it purchased.   Plaintiffs claim that McKee and Finkel-Minken took for themselves and/or NARCO significant revenues from the Hansen companies that NARCO had purchased.  As a result, creditors foreclosed on the properties and assets sold to NARCO, precluding plaintiffs from recouping their losses based on NARCO's failure to perform.

At some point, Hansen, Interstate Energy, and Triple M presented the BNI bank guarantees and letters of credit to BNI branches in New York, New York and Jakarta, Indonesia.  BNI refused to honor any of the financial instruments on the grounds that they were fraudulent and not issued by BNI or any of its employees.

While plaintiffs maintain that the BNI bank guarantees are genuine instruments, validly issued by BNI, plaintiffs simultaneously allege in the alternative that if the BNI bank guarantees are fraudulent, plaintiffs were the victim of an elaborate fraudulent conspiracy, in which case NARCO (and its agents) and Newcomb should be held accountable.

<u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Utah R. Civ. P. 56(c). The court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence upon which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

<u>DISCUSSION</u>

The plaintiffs' claims against Newcomb can generally be divided into two groups: (1) fraud and (2) claims that are predicated on fraud.

**1.     Fraud**

In order to succeed in an action for fraud under Utah law, plaintiffs must prove, by clear and convincing evidence: (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage. *Orient Mineral Co. v.*

*Bank of China*, 506 F.3d 980, 1005 (10th Cir. 2007) (citing *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066–67 (Utah 1996)).

Newcomb claims the court can decide as a matter of law that plaintiffs' fraud claim against him fails on any one of the following grounds. Newcomb's only role in the June 2003 agreements was as a custodian of certain BNI bank guarantees issued to NARCO and he had no involvement in the 2004 agreement. Plaintiffs have not established that Newcomb said anything that was false. Plaintiffs cannot show reliance because Newcomb only communicated with Hansen after Hansen entered the June 2003 agreements and he only spoke with McDougal after Triple M entered the November 2003 agreement. It is completely unreasonable that plaintiffs would rely on any statement by Newcomb because plaintiffs performed their own substantial due diligence on NARCO and BNI and because Newcomb only spoke to Hansen a handful of times by phone and McDougal once. Plaintiffs have not provided any specific evidence that Newcomb knew he made false statements or that he intended to defraud anyone. Finally, there is no documentary evidence to raise a genuine issue as to the existence of injuries suffered by plaintiffs.

In response, plaintiffs argue that Newcomb is not entitled to summary judgment because of disputed material facts. Plaintiffs claim that Newcomb provided them with demonstrably false information, including statements regarding NARCO's financial capabilities, its ownership of a refinery, and personal verification of the BNI bank guarantees. According to Hansen, there is "strong" evidence of fraudulent intent because Newcomb had a long-standing relationship with McKee and Newcomb knew about Hansen's transactions when he made the false statements. Hansen also argues that he relied on Newcomb's representations because but for Newcomb statements he would not have performed on the June 2003 agreements or entered into the 2004 agreement. Hansen contends that his reliance was

reasonably because he believed that Newcomb was NARCO's investment banker. Lastly, plaintiffs contend that they established sufficient evidence of injuries because Hansen and McDougal repeatedly testified regarding damages caused by Newcomb's false statements.

The court has carefully considered the parties' submissions. The court finds that plaintiffs have failed to provide sufficient facts upon which a reasonable jury could find clear and convincing evidence that Newcomb was knowingly or recklessly fraudulent. The court also finds that plaintiffs have presented insufficient facts to support a claim that they relied on representations made by Newcomb. Therefore, the court grants summary judgment in favor of Newcomb on plaintiffs' fraud claim. In so doing, the court adopts the positions of Newcomb in his memoranda.

For example, the court adopts Newcomb's position that plaintiffs have not submitted evidence that Newcomb knew his statements to be false or that he intended to defraud plaintiffs. Instead, both Hansen and McDougal testified that they do not believe Newcomb intentionally misled them. In particular, Mr. Hansen stated:

> I think that Fred Newcomb is a straight up, honest guy. The research I did on him and that others in my company checked out appeared to be that he was a straight honest guy. He was fully licensed, and he appeared to have a good reputation, without complaints by the securities division and others.
>
> So based on all that and the spirit of [our] conversations, I think that he believes – believed at the time what NARCO was about, what they were trying to do, their business plan, their business model, these banking relationships with BNI, I think he thought it was all straight up and legitimate. As time has gone on, and I have learned additional information and things have gone out, I won't know if he was just the opposite of what I think him to be unless we see where this thing ends up.

(Dkt. No. 196-9, Hansen Dep. 94:11–23.) Four years after filing their complaint against Newcomb, plaintiffs are still waiting to see where "things end up." It is not enough for plaintiffs to maintain their fraud claim against Newcomb on mere speculation. *See Anderson*, 477 U.S. at 252 ( "The mere existence of a scintilla of evidence in support of plaintiff's

position will be insufficient [to overcome a motion for summary judgment]; there must be evidence upon which the jury could reasonably find for the plaintiff.").

Similarly, the court adopts Newcomb's position that plaintiffs did not rely on Newcomb because plaintiffs' telephone conversations with Newcomb occurred after the agreements plaintiffs were allegedly induced to enter. Hansen said he first spoke with Newcomb "in or about early June," which was after the June 2003 agreements. Similarly, McDougal says he spoke to Newcomb only once, in December 2003 or January 2004, which would have been months after his November 2003 agreement. When Newcomb spoke with Hansen and McDougal, they were already contractually bound to act in the way that they did. Moreover, there is nothing in the complaint that supports plaintiffs position that Hansen relied on false statements made by Newcomb to enter into the 2004 agreement.

For at least the above reasons, plaintiffs have failed to present sufficient evidence upon which a reasonable jury could find that Newcomb committed fraud.

**2.     Remaining Claims**

Moreover, in as much as the fraud claim supports the remaining claims against Newcomb, summary judgment is also granted. Plaintiffs' claims for conversion, unjust enrichment, and breach of covenant of good faith and fair dealing also fail on independent grounds.  First, plaintiffs' claims for conversion and unjust enrichment fail as a matter of law because there are insufficient facts that Newcomb received any benefit, or anything of value, from any of plaintiffs.  Second, plaintiffs' claims for breach of the covenant of good faith and fair dealing fail as a matter of law because plaintiffs never had any contract or agreement with Newcomb.

## CONCLUSION

For the reasons stated above, Newcomb's motion for summary judgment is

GRANTED. Because the record may be more fully developed in the future, plaintiffs' claims

against Newcomb are dismissed without prejudice.

IT IS SO ORDERED.

DATED this 10th day of May, 2010.

_____
Dee Benson
United States District Judge